# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01393-COA

**SEAN HARDEN**                                                                          **APPELLANT**

**v.**

**DANIELLE DAWN SCARBOROUGH**                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/30/2016 |
| TRIAL JUDGE: | HON. SANFORD R. STECKLER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | HAROLD O. GRISSOM JR. PRESTON ANDREW GRISSOM |
| ATTORNEY FOR APPELLEE: | DIANNE HERMAN ELLIS |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 03/27/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE LEE, C.J., WILSON AND WESTBROOKS, JJ.

### WILSON, J., FOR THE COURT:

¶1. In this child custody dispute, the father, Sean Harden, argues that the chancellor erred by awarding physical custody of the parties' son, Rhett, to the mother, Danielle Scarborough. Harden also argues that the chancellor erred in setting child support, by considering hearsay, by enjoining both parties from routinely visiting Rhett's daycare or school during the day, and by enjoining both parties from sharing pictures of Rhett on social media. For the reasons that follow, we find no error and affirm the chancellor's rulings on child custody and child support. We also find that Harden's hearsay argument is without merit. However, we reverse and render the orders restricting the parties' visits to Rhett's daycare and prohibiting

them from sharing pictures of the child on social media. We reverse on those issues because there was no evidence that either issue had caused any harm to the child or that either parent had visited the school or shared photos inappropriately.

## FACTS AND PROCEDURAL HISTORY

¶2. Harden and Scarborough began dating around August 2013. Their son, Rhett, was born in October 2014. Harden and Scarborough never married but cohabited at Harden's home from June 2014 until May 2015. Harden is a high school teacher and coach. He resigned as head football coach at the school during this litigation but continues to teach and coach powerlifting. Scarborough is a registered nurse at a hospital.

¶3. On May 25, 2015, Scarborough, with Rhett, moved out of Harden's house. On June 1, 2015, she filed a complaint to establish paternity, custody, and child support. On June 17, 2015, Harden filed an answer and counterclaim for custody and child support.

¶4. After Scarborough moved out of Harden's house, she enrolled Rhett in a new daycare without notifying Harden, and she did not allow Harden to see Rhett again until July 5, 2015. Scarborough testified that the new daycare was closer to her work, and her daughter from a prior relationship had attended it. Scarborough testified that she denied Harden visitation from May 25 to July 5 on the advice of her former attorney because there was no court order in place. During that time, Scarborough and Harden communicated primarily by text message and through their attorneys. The record includes hundreds of pages of the parties' text messages from both before and after their separation.

¶5. On July 21, 2015, the court entered a temporary order granting Scarborough and

Harden joint legal custody, Scarborough temporary physical custody, and Harden weekend visitation. The court also ordered Harden to pay child support of $541.50 per month.

¶6. A trial was held March 22–25, 2016. Scarborough testified and called her mother, father, and daughter as witnesses. Harden testified and called his mother as a witness. A fellow teacher and former principal at Harden's school also testified briefly.

¶7. The chancellor ruled from the bench at the conclusion of the trial and subsequently entered a written judgment establishing custody, visitation, and support. The chancellor made findings under *Albright*[1] and awarded Scarborough physical custody of Rhett with joint legal custody and visitation for Harden. The chancellor awarded Harden visitation consisting of alternating weekends, alternating Thursday afternoons, most of the summer, and specified holidays. The chancellor ruled that child support would remain at $541.50 per month, as set by the temporary order. The final judgment also prohibited both Harden and Scarborough from posting pictures of Rhett on social media. Finally, the judgment provided that Harden and Scarborough were encouraged to participate in Rhett's extracurricular and school activities, including all parties and special events at his school or daycare, but neither party should "routinely visit any daycare or school, for lunch or otherwise," or without "a specific purpose for such visit."

¶8. On appeal, Harden argues that the chancellor misapplied the "tender years doctrine" and erred in applying most of the *Albright* factors. Harden also argues that the chancellor erred in setting child support because the chancellor failed to account for Harden's

---

[1] *See Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

resignation as football coach and anticipated loss of income. Finally, Harden argues that the chancellor abused his discretion by enjoining both parties from posting pictures of Rhett on social media and by limiting visits to Rhett's school or daycare. Scarborough did not file a cross-appeal, but in her brief on appeal she asserts that the chancellor erred by ordering that Rhett's last name should be changed to Harden on his birth certificate and other records. She also asserts that Harden's appeal is frivolous and requests an award of attorney's fees. Additional facts are discussed below as relevant and necessary.

## ANALYSIS

### I. Child Custody

¶9. "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). Thus, on appeal in a child custody case, the issue is not whether this Court "agrees with the chancellor's ruling," but only whether "the chancellor's ruling is supported by credible evidence." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004).

¶10. "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. In evaluating the child's best interest, the chancellor must consider the following factors: (1) age, health, and sex of the child; (2) which parent had "continuity of care prior to the separation"; (3) "which has the best

4

parenting skills"; (4) which has "the willingness and capacity to provide primary child care"; (5) both parents' employment responsibilities; (6) "physical and mental health and age of the parents"; (7) "emotional ties of parent and child"; (8) "moral fitness of the parents"; (9) "the home, school and community records of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the home environment and employment of each parent; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Id.*

¶11.    The chancellor must address each *Albright* factor that is applicable to the case. *See Powell v. Ayars*, 792 So. 2d 240, 244 (¶10) (Miss. 2001). However, the chancellor need not decide that each factor favors one parent or the other. *See Weeks v. Weeks*, 989 So. 2d 408, 411 (¶12) (Miss. Ct. App. 2008). Nor does *Albright* require that "custody must be awarded to the parent who 'wins' the most factors." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). "The point of *Albright* is to identify the custody arrangement that would be in the child's best interest—not to determine what is in either parent's best interest or which parent is the better person." *Vassar v. Vassar*, 228 So. 3d 367, 375 (¶26) (Miss. Ct. App. 2017) (citing *Reno v. Reno*, 253 Miss. 465, 475, 176 So. 2d 58, 62 (1965)); *Hollon v. Hollon*, 784 So. 2d 943, 947 (¶12) (Miss. 2001). "[T]he chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). We review the chancellor's application of the factors for manifest error, giving deference to the weight that he assigned each factor. *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016).

¶12. Harden claims that the chancellor erred in two ways when he awarded physical custody of Rhett to Scarborough. First, Harden claims that the chancellor misapplied the "tender years doctrine" by requiring him to prove that Scarborough was an unfit parent. Second, Harden argues that the chancellor's specific findings and ultimate decision under *Albright* lack support in the evidence.

¶13. We begin by addressing Harden's "tender years" argument. Prior to the 1980s, our Supreme Court "held that if the mother of a child of tender years . . . is . . . fit, then she should have custody." *Law v. Page*, 618 So. 2d 96, 101 (Miss. 1993). However, "over the years, the tender-years doctrine has been diminished and is now only a presumption." *Smith v. Smith*, 206 So. 3d 502, 513 (¶26) (Miss. 2016) (citing *Law*). "The doctrine is 'even less binding when the child is male.'" *Id.* (quoting *Law*). Today, "age is only one of several factors to be considered" under *Albright*. *Id.* (quoting *Mercier v. Mercier*, 717 So. 2d 304, 317 (¶14) (Miss. 1998)); Deborah H. Bell, *Mississippi Family Law* § 12.01[4][a] (2d ed. 2011) (stating that Mississippi has "abandoned the maternal preference" and that a child's age is only one of several factors considered in a custody decision).[2]

¶14. The chancellor's ruling in this case was consistent with the law as it currently stands. The final judgment states in relevant part:

> While there is a preference for putting children of "tender years" with the
> mother as opposed to the father, in the event that the father has demonstrated

---

[2] In 2000, the Legislature amended Mississippi Code Annotated section 93-5-24 to provide specifically that there "shall be no presumption that it is in the best interest of a child that a mother be awarded either legal or physical custody." Miss. Code Ann. § 93-5-24(7) (Rev. 2013); *see* 2000 Miss. Laws ch. 453. Nonetheless, as recently as *Smith* (2016), the Mississippi Supreme Court has continued to discuss a tender years "presumption."

6

that he is able to handle the young child as well as mother, then that difference does not exist. There was a good bit of testimony with regard to that. . . . [T]he Court does not find that it is a major factor in this case. This factor is neutral.

This finding was also consistent with the chancellor's statements during his bench ruling. Harden points to comments that the chancellor made *prior to trial*, which seemed to reflect an outdated view of the tender years doctrine. However, Harden's attorney provided the court with case law on this issue, the chancellor corrected himself, and his bench ruling and the final judgment correctly applied the law. Thus, Harden's argument is without merit.

¶15.    We next address the chancellor's application of the *Albright* factors and Harden's criticisms of the same. The chancellor found that continuity of care, willingness and capacity to provide primary care, and "other factors relevant to the parent-child relationship" favored Scarborough, while all other factors were neutral or inapplicable. Harden argues that the three factors found to favor Scarborough actually favored him or were at least neutral. Harden also argues that his employment responsibilities favor him and that he has better parenting skills and superior morals. We address these arguments in turn.

¶16.    *Continuity of care.*  The chancellor found that "[t]he continuity of care prior to separation was with both parents," and although Harden "did more than many fathers, and probably most fathers, overall [Scarborough] did more of the hands-on care of the child." Therefore, the chancellor found that this factor favored Scarborough, although only slightly. We find no manifest error or abuse of discretion in this respect. This issue basically turned on the parties' conflicting testimony as to who provided care to Rhett on a more regular basis prior to their separation. The chancellor, as the finder of fact, was entitled to credit

7

Scarborough's testimony. *See, e.g.*, *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013); *Powell*, 792 So. 2d at 243 (¶6).

¶17.  *Willingness and capacity to provide primary childcare.*  The chancellor found that "[b]oth parties have a willingness and capacity to provide care for . . . Rhett," but he found that the factor fell "more into [Scarborough's] ability."  Harden argues that this was error because he proved that he was willing and able to care for Rhett and even resigned as head football coach to spend more time with Rhett.  However, this issue also turned primarily on the parties' conflicting testimony.  In addition, the chancellor noted that Scarborough had "already raised, with the help of her mother," a daughter from a prior relationship. Scarborough's daughter, Chandler, was seventeen years old at the time of trial, and the chancellor found that she was "a delightful person" and "an example of the way you would like to find a child to be."  There is no basis for this Court to say that the chancellor manifestly erred or abused his discretion in resolving the parties' conflicting testimony. Moreover, the chancellor specifically found that Harden was willing and capable of providing care—he only found that this factor favored Scarborough to some degree.

¶18.  *Parenting skills.*  Harden argues that he has better parenting skills, and he criticizes the chancellor for failing to address this factor specifically.  While the chancellor did not expressly state that this factor favored either parent or use the phrase "parenting skills," it is apparent that he considered the parties' parenting skills in connection with his consideration of the two factors discussed just above.  It was up to the chancellor, as the finder of fact, to weigh and consider the conflicting evidence, and we cannot say that he manifestly erred or

8

abused his discretion. *See Dobson v. Dobson*, 179 So. 3d 27, 31 (¶¶14-15) (Miss. Ct. App. 2015) (holding that the chancellor's omission of a specific finding as to which party had better parenting skills was insignificant because the chancellor clearly considered the relevant facts).

¶19. *Employment and employment responsibilities of the parents.* The chancellor found that this factor was neutral and that neither party's employment had interfered with his or her parental responsibilities. Harden argues that the chancellor erred because his job as a teacher and coach affords him more time and greater flexibility than Scarborough's job as a nurse. Scarborough testified that she works thirty to sixty hours a week at Garden Park Medical Center; that she ordinarily works from 8:30 a.m. to 5:00 p.m., although her schedule sometimes varies; and that her parents and her daughter are available to provide childcare if she has to work late. The evidence did not show that Scarborough's employment had interfered with her duties as Rhett's mother. Harden emphasizes that he does not have to work during the summer, and the chancellor took this into account by awarding Harden extensive summer visitation that far exceeds Scarborough's periods of custody in those months. However, given the lack of evidence that Scarborough's job as a nurse has ever interfered with her ability to parent, we cannot say that the chancellor manifestly erred or abused his discretion in finding this factor neutral.

¶20. *Moral fitness.* The chancellor stated that moral fitness is "probably one of the most difficult things for a judge to determine," and he found this factor to be neutral. He found that "both of the parties are basically good people" who need to make "behavioral changes"

9

in some areas. Harden argues that this was error because his morals are superior to Scarborough's. Harden relies on his own testimony that Scarborough, among other things, smoked while she was pregnant, smoked in Rhett's presence, and twice discussed the possibility of having an abortion—once when she first learned that she was pregnant and a second time when they argued and she was "upset." However, Scarborough denied that she ever smoked during her pregnancy or in Rhett's presence, and the specifics of any discussion of an abortion are unclear. Harden also emphasizes that Scarborough interfered with his relationship with Rhett and denied him visitation for about forty days after she moved out of his house. Scarborough testified that she withheld visitation on the advice of her attorney because no court order was in place. In any event, the chancellor considered this issue and specifically criticized Scarborough for interfering with Harden's relationship with Rhett. Thus, the chancellor considered the relevant facts and evidence, and we cannot say that he clearly erred or abused his discretion by finding this factor to be neutral.

¶21. *Stability of the home environment and employment of each parent.* The chancellor found this factor to be neutral. Harden argues that this factor favors him because he continues to own the three-bedroom home where Rhett lived until he was almost eight months old. Scarborough lives in a three-bedroom apartment, she and Rhett have lived in the same apartment complex since she moved out of Harden's house, she has worked at the same hospital since Rhett was born, and she previously worked at another hospital for eight years before Rhett's birth. Based on the evidence presented at trial, we cannot say that the chancellor manifestly erred by finding that Scarborough had a stable home environment and

10

stable employment or by finding that this *Albright* factor was neutral.

¶22.    *Any other factors relevant to the parent-child relationship.* The chancellor found that certain other factors favored Scarborough to at least some degree. He found that Rhett had developed "a strong bond" with his half-sister, Chandler, and that Scarborough's mother "was a big help" in caring for Rhett. The chancellor also found that Harden's family harbored "a very strong dislike" toward Scarborough, which was "not likely to change very much." Accordingly, the chancellor concluded that it would be "be far easier for [the parties] to co-parent Rhett" if Scarborough had physical custody.

¶23.    On appeal, Harden argues that there is no evidence of a significant "bond" between Chandler and Rhett, that Chandler will leave for college soon anyway, and that the animosity between Scarborough and his family is Scarborough's fault. Harden also argues that the chancellor should have considered different issues under this factor. He asserts that the chancellor should have given more weight to Scarborough's interference with his visitation and relationship with Rhett. He also contends that the chancellor should have considered that Chandler stayed with her maternal grandparents for significant periods of time, rather than with Scarborough.[3] The evidence on these issues was conflicting and open to different interpretations. We cannot say that the chancellor considered any improper factor or that he abused his discretion or clearly erred in weighing the evidence presented.

¶24.    "Determining custody of a child is not an exact science." *Lee v. Lee*, 798 So. 2d 1284,

---

[3] Scarborough acknowledged that at times in the past Chandler stayed with her maternal grandparents "as much as she stayed with [Scarborough]" because Scarborough was working "at least . . . three to four night shifts a week."

11

1288 (¶15) (Miss. 2001). It "is one of the most difficult decisions that courts must make." *Brewer v. Brewer*, 919 So. 2d 135, 141 (¶21) (Miss. Ct. App. 2005). The chancellor clearly found both Scarborough and Harden to be fit parents or else he would not have awarded Harden such extensive visitation. In determining custody, he applied and weighed the *Albright* factors and made appropriate findings of fact with support in the evidence. "It requires little familiarity with the institutional structure of our judicial system to know that this Court does not sit to redetermine questions of fact." *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985). In addition, this Court will not "second guess" the chancellor's custody decision absent some legal or manifest error. *Irle v. Foster*, 176 So. 3d 25, 31 (¶26) (Miss. Ct. App. 2013), *aff'd*, 175 So. 3d 1232 (Miss. 2015). Therefore, we affirm.

## II. Child Support

¶25. The statutory "child support award guidelines shall be a rebuttable presumption in all . . . proceedings regarding the awarding or modifying of child support awards in this state" and shall "apply unless the [judge] makes a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate." Miss. Code Ann. § 43-19-101(1)-(2) (Rev. 2015). As relevant in this case, the guidelines establish a rebuttable presumption that support for one child should equal fourteen percent of the payor's adjusted gross income. *Id.*

¶26. Harden submitted a financial statement showing gross income of $6,122.08 per month with deductions for state income taxes ($254), federal income taxes ($984.08), Social Security ($377.03), insurance ($88.18), and retirement (PERS) ($550.99), resulting in

adjusted gross income of $3,867.80 per month. At the temporary hearing, the chancellor followed the statutory guidelines and set support at fourteen percent of Harden's adjusted gross income, i.e., $541.50 per month. After trial, the chancellor ruled that Harden's support obligation would remain at that amount. "An award of child support is a matter within the discretion of the chancellor and we will not reverse that determination unless the chancellor was manifestly wrong in his finding of fact or manifestly abused his discretion." *Porter v. Porter*, 23 So. 3d 438, 449 (¶7) (Miss. 2009) (quoting *Dufour v. Dufour*, 631 So. 2d 192, 194 (Miss. 1994)). "[C]learly there was no abuse of discretion, as the chancellor found the required support equal to the amount that is presumptively correct under the child-support guidelines." *Mosher v. Mosher*, 192 So. 3d 1118, 1126 (¶38) (Miss. Ct. App. 2016).

¶27. On appeal, Harden argues that the chancellor improperly "imputed income" to him by not taking into account the loss of income that Harden anticipated due to his resignation as head football coach. At trial in March 2016, Harden introduced the same financial declaration, described above, showing gross income of $6,122.08 per month and adjusted gross income of $3,867.80 per month. He then testified that he anticipated that his pay would be reduced "at the end of August of 2016." He further testified:

> Q. Okay. Do you have an inclination how much it would be reduced? How much your – whether it's by year, paycheck or what have you?
>
> A. By year, probably between 14 to 18,000.

On cross-examination, Harden explained that he gave an estimate of $14,000 to $18,000 because he was still considering resigning as the powerlifting coach, which would result in a loss of income of $4,500 per year.

¶28. We disagree with the basic premise of Harden's argument—that the chancellor "imputed income" to him. The chancellor simply applied the statutory support guidelines to the adjusted gross income shown on Harden's own financial declaration. The chancellor was not required to predict and calculate a future adjusted gross income based only on Harden's estimate of how much his annual income would "probably" decrease five months in the future. Obviously, the chancellor could not just divide Harden's $14,000 estimate by twelve and then subtract that amount from Harden's monthly adjusted gross income at the time of trial. The decrease in gross income that Harden predicted would also result in decreases to his itemized deductions for taxes and PERS. However, Harden has never calculated or articulated—either at trial or on appeal—what figure he thinks the chancellor should have used for his adjusted gross income. Accordingly, for purposes of this appeal, it is unnecessary for us to say whether Harden's voluntary resignation as football coach would be a basis for imputing income to him. We simply hold that the chancellor did not abuse his discretion by setting child support based on the statutory guidelines and Harden's admitted adjusted gross income at the time of trial.

### III. Scarborough's Testimony About Her Former Attorney's Advice

¶29. At trial, Scarborough testified that she did not allow Harden to have visitation with Rhett for about forty days after she moved out of his house because there was no court order in place and she was afraid that Harden might not return Rhett to her. Scarborough also testified that her former attorney, who died prior to trial, told her that he could "not guarantee that [Harden] would bring [Rhett] back to [her]" and "suggested that until [they] went to

14

court and got some paperwork," she should not permit visitation. Harden objected to this testimony as hearsay, but the chancellor overruled the objection, stating that Scarborough was only "giving the reason why she did what she did." The chancellor later commented that he believed Scarborough's testimony on this point, and he had "known [the deceased attorney] quite well and ha[d] to clean up a lot of cases that he was involved in." Harden argues that the chancellor erred by admitting and considering the testimony and by taking into account his prior experiences with the deceased attorney.

¶30. The standard of review for decisions involving the admission or exclusion of evidence is abuse of discretion. *Owens v. Kelly*, 191 So. 3d 738, 741 (¶12) (Miss. Ct. App. 2015). In addition, "[f]or a case to be reversed based on the admission or exclusion of evidence, a party must be actually prejudiced, harmed, or have a substantial right adversely affected." *Ill. Cent. R.R. v. Brent*, 133 So. 3d 760, 779 (¶42) (Miss. 2013).

¶31. Hearsay is an out-of-court statement that is offered "to prove the truth of the matter asserted in the statement." M.R.E. 801(c). Conversely, "[a] statement that is not offered to prove the truth of the matter asserted is not hearsay." *Baldwin v. State*, 784 So. 2d 148, 159 (¶40) (Miss. 2001). Thus, an out-of-court statement that is offered only—as the chancellor put it—to explain "why [the witness] did what she did" is not hearsay. *See Thomas v. State*, 195 So. 3d 843, 847–48 (¶11) (Miss. Ct. App. 2016) (holding that a law enforcement officer's testimony about what an informant told him was admissible to explain the basis for the officer's investigation); *Fullilove v. State*, 101 So. 3d 669, 675 (¶20) (Miss. Ct. App. 2012) ("Statements do not constitute hearsay when admitted to explain an officer's course

15

of investigation or motivation for the next investigatory step by that officer."). Accordingly, other courts have held that testimony about an attorney's advice is not hearsay if it is offered to explain why the witness did what she did—i.e., as "circumstantial evidence of [the witness's] state of mind"—and not "to prove the truth of the matter asserted." *States v. Scully*, 877 F.3d 464, 474 (2d Cir. 2017). Moreover, a party "is competent to testify to the advice he received from counsel, even if his testimony is one-sided and self-serving." *Id.* at 475. Whether the testimony is credible is an issue for the fact-finder. *Id.*

¶32. In this case, Scarborough's testimony about her former attorney's advice obviously was not offered to prove the truth of the matter asserted. That is, her testimony was not offered as evidence that Harden might have absconded with Rhett or that Harden could not have been required to return Rhett without a court order. Rather, it was offered as evidence of Scarborough's "state of mind" and why she withheld visitation from Harden after she moved out of his house. Therefore, we find no abuse of discretion in the chancellor's ruling overruling Harden's objection.

¶33. Nor is reversal required because of the chancellor's remark about his prior experience with the deceased attorney. This comment was not part of the chancellor's ruling, and there is nothing to indicate that the chancellor's prior experiences played a role in his custody decision in this case. Accordingly, any error was harmless. *Cf. Inge v. Inge*, 227 So. 3d 1185, 1190 (¶17) (Miss. Ct. App. 2017) (holding that an erroneous finding of fact was harmless because there was "no indication that the issue impacted [the chancellor's] ultimate decision"); *Hill v. Johnson*, 27 So. 3d 426, 430 n.2 (Miss. Ct. App. 2009) (holding that

16

erroneous findings of fact were "harmless error as they ha[d] no bearing on the ultimate disposition of the case").

## IV. Limitations on Social Media and Visits to Rhett's Daycare and School

¶34. Harden also argues that the chancery court abused its discretion by enjoining the parties as follows:

> Neither party shall post any photographs of the minor child on Facebook or any other social media, nor will they allow any person within the sphere of his or her influence to do so. Any actions of a third party shall be deemed to be the actions of the parents for the purposes of contempt.
>
> . . . .
>
> Both parties agree that both parents shall be notified in advance and encouraged to participate in all school, recreational, extracurricular, and other activities of the child. Neither party shall routinely visit at any daycare or school, for lunch or otherwise, but both are welcome to participate in all parties, special events, or special occasions at the school or daycare and shall visit only if said parent has a specific purpose for such visit.

¶35. On this point, we agree with Harden. There is no evidence that either party or their families shared inappropriate photos of Rhett on Facebook or other social media. Nor is there any evidence that either party visited Rhett's daycare in a way that was disruptive or inappropriate. Finally, there is no evidence that Rhett was ever harmed or threatened with harm because either of his parents shared his photos on social media or visited his daycare. At most, there is some indication that these issues were a source of discord between Harden and Scarborough. However, "[i]n the absence of conduct harmful to children, . . . a court cannot dictate what would normally be parental decisions about a child's health, education, and welfare." Deborah H. Bell, *Mississippi Family Law* § 12.05 at 368 (2d ed. 2011); *cf. Cox*

17

*v. Moulds*, 490 So. 2d 866, 868 (Miss. 1986) ("something approaching actual danger or other substantial detriment to the children—as distinguished from personal inconvenience or possible offense to middle class sensibilities—is required before a chancellor may restrict visitation"); *Mord v. Peters*, 571 So. 2d 981, 983-86 (Miss. 1990) (similar). As to social media, Scarborough and Harden will just have to get along. As to visits to Rhett's daycare or school, they should follow the policy that the daycare or school sets for all parents. We reverse and render as to these provisions of the chancery court's final judgment.

## V. Issues Raised in Scarborough's Brief

¶36. In Scarborough's brief on appeal, she argues that the chancellor erred by ordering the parties to change Rhett's surname to Harden on his birth certificate. We first note that this contradicts Scarborough testimony at trial. In response to questions from her own attorney, Scarborough specifically testified that she had no objection to a court order requiring that Rhett's name be changed to Harden. More important, Scarborough did not file a cross-appeal. "In order for the appellee to gain reversal of any part of the decision of a trial court about which the appellant brings no complaint, the appellee is required to file a cross-appeal." *Watkins Dev. LLC v. Hosemann*, 214 So. 3d 1050, 1053 (¶13) (Miss. 2017) (quotation marks, alteration omitted). Therefore, we will not address this issue. *Id.*

¶37. Scarborough also argues that she is entitled to damages and attorney's fees under Mississippi Rule of Appellate Procedure 38 because Harden's appeal is frivolous. *See* M.R.A.P. 38 ("In a civil case if the Supreme Court or Court of Appeals shall determine that an appeal is frivolous, it shall award just damages and single or double costs to the

appellee."). "[A]n appeal is frivolous under Rule 38 where the appellant has no hope of success." *Harris v. Harris*, 988 So. 2d 376, 380 (¶16) (Miss. 2008). Harden's appeal was not frivolous. Therefore, Scarborough's request is denied.

## CONCLUSION

¶38. We affirm the judgment of the chancery court except to reverse, render, and strike the above-quoted provisions limiting parental visits to Rhett's daycare or school and enjoining the parties from sharing photos of Rhett on social media. We deny Scarborough's request for damages and attorney's fees on appeal.

¶39. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**